## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

IN RE THE APPLICATION OF:

PETER MIKOVIC,

                Petitioner,

vs.                                              Case No. 3:07-cv-697-32TEM

AMY ANN MIKOVIC,

                Respondent.

_____

## <u>ORDER</u>

This matter is before the Court on a verified petition filed pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1988 WL 411501 ("Hague Convention" or "Convention"), and its implementing legislation, the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601-11610 ("ICARA"). Petitioner Peter Mikovic is seeking return of his child MPM to the United Kingdom, Wales, alleging that the child was illegally abducted to the United States by the child's mother, Respondent Amy Ann Mikovic. The Court considers the The Verified Petition, Pursuant To The Hague Convention, For Return Of Child To The Country Of Habitual Residence (Doc.1), Respondent's answer, declaration and affirmative defenses (Doc. 13), and the trial brief of the respondent. (Doc. 25.) The Court conducted a full and final evidentiary hearing on the Petition on

October 18, 2007, at which the parties submitted testimonial and documentary evidence and argument of counsel.  (Doc. 30.)

## I.    Evidence

Petitioner and Respondent are estranged husband and wife, and are the parents of their three year old child MPM.  Their separation is complicated by the fact that Mr. Mikovic, a citizen of Slovakia, is unable to return to the United States until at least 2013 as a result of his overstaying his visa and subsequent deportation.  Mrs. Mikovic is a citizen of the United States.  The following facts are based on the testimony of the Petitioner and Respondent, several witnesses called by Petitioner, and exhibits submitted by both parties at the evidentiary hearing.  Mr. Mikovic appeared by trans-Atlantic video conferencing from Wales, where he resides.[1]

Peter Mikovic first came from Slovakia to the United States on a six-month visitor's visa in 1995 to work in building construction.  The Mikovics met in December 2000 in Jacksonville, Florida and began dating in January 2001.  A few months after they started dating, Mr. Mikovic told Respondent that he was in the United States illegally.  They were married in Jacksonville Beach, Florida on February 7, 2002. Initially, the couple lived in a rental home, but at the end of 2002, they together purchased a home in Jacksonville. Mrs. Mikovic, a dental hygienist, testified that she

---

[1]    The Court thanks His Honour Judge Mark Furness, Newport County Court, Newport, South Wales, and his Judicial Clerk Sarah Worman, for their kind assistance in facilitating trans-Atlantic testimony.

2

paid the mortgage on the house.

In 1998, the United States government initiated removal proceedings against Mr. Mikovic and on December 28, 1999, he was ordered removed *in absencia* from the United States to Slovakia by the Immigration Court.  (Petitioner's Ex. 2.)  Mr. Mikovic contends that he never received notice of the removal proceedings and was unaware of the deportation *in absencia*.  On January 8, 2003, Mrs. Mikovic filed a petition with the Immigration Court on her husband's behalf for permission to reapply for admission to the United States.  However, Mr. Mikovic was detained on February 21, 2003 pursuant to the order of removal and incarcerated for the next five months.

On June 27, 2003, Peter Mikovic was deported from the United States.  After deportation, Mr. Mikovic went to Slovakia to live and Mrs. Mikovic joined him on July 2, 2003, returning to Jacksonville on July 20, 2003 because of her job.  She sold Mr. Mikovic's truck and tools after he was deported.  During this period, the parties were in constant contact, and Mrs. Mikovic worked with an attorney to have the deportation decision reversed.  She has continuously tried to help Mr. Mikovic become an American citizen.[2]  The Mikovics' appeal for reconsideration of the deportation order

_____

[2]   Mrs. Mikovic states that she spent $15,000 of her inheritance money on legal fees in an attempt to secure Mr. Mikovic's readmission into the United States.  Mr. Mikovic said that though he was in Slovakia after deportation, Mrs. Mikovic had money from the sale of his car and tools.

3

was unsuccessful.[3]   The Mikovics' immigration attorney described Mrs. Mikovic as "anguished about the situation . . . anguished and frustrated."

Mrs. Mikovic returned for a second visit to Slovakia from October 27, 2003 until March 18, 2004, living with Mr. Mikovic in his house, and maintaining her own bank account.  She brought with her $10,000 that she said she had inherited, which she said she spent to improve her husband's house in Slovakia.  During this period, Mrs. Mikovic worked as a dental hygienist in Slovakia for a week and a half, having acquired a permanent resident visa to live in Slovakia and a work permit.  The job did not work out because she could not speak the language.  Mrs. Mikovic testified that she was not happy in Slovakia.

Mrs. Mikovic became pregnant and returned to Jacksonville on March 18, 2004; MPM was born in Jacksonville on August 12, 2004.  The child is a dual citizen of the United States and Slovakia.  While in the United States, Mrs. Mikovic again filed immigration paperwork seeking permission for her husband to reapply for admission to the United States.  Mrs. Mikovic obtained a passport for MPM and returned to Slovakia with MPM on October 16, 2004, renting the Jacksonville house to a tenant.

_____

[3]     The Mikovics' immigration attorney, David Fletcher, testified that so long as the couple remains married, Mrs. Mikovic can file on her and MPM's behalf a request for waiver seeking permission for Mr. Mikovic to reapply for admission based upon hardship, a process that can take six months to a year or longer, and as to which the chances for success are slim.  Mr. Fletcher said he is unaware of any procedure available to Mr. Mikovic to pursue permission to enter the United States prior to 2013 if the couple is divorced.

During this second trip to Slovakia, Mr. and Mrs. Mikovic discussed the possibility of moving to an English-speaking country to accommodate Mrs. Mikovic.  According to Mr. Mikovic, the discussions were to "make sure everybody's happy, a compromise, . . . Make sure we stay together."  Mrs. Mikovic and the baby stayed in Slovakia with Mr. Mikovic for three months until January 2005, but again Mrs. Mikovic was not happy, feeling isolated in her husband's rural house while he was gone, not knowing anyone or being able to speak the language, and not having access to an automobile or other transportation: "[W]e argued the whole - most of the time in Slovakia.  It was an awful experience for me.  And he helped me pack the bags, he took us to the airport and he kissed [MPM] good-bye and at that point it was over for me."  She returned to the United States with MPM on January 15, 2005.

The circumstances surrounding Mrs. Mikovic's return to the United States in January 2005 where she and MPM lived for a year until January 2006 (except for a one-month trip to Slovakia) are in dispute.  Mrs. Mikovic testified that in her mind, the marriage was over as of January 2005, the couple was separated, and that she stayed in Jacksonville for that year with MPM without any objection from Mr. Mikovic. During that year, she resumed working part-time, and paid the mortgage on the house.  Mrs. Mikovic acknowledged that she and her husband continued to stay in touch.  Mr. Mikovic testified that Mrs. Mikovic returned to Jacksonville to take care of her grandmother.  He said that he did not consider that the couple was separated or

the marriage broken during this period because he and his wife called each other on the telephone "all the time."  He also spoke with the baby on the phone during the year.  Further, Mr. Mikovic said that though he did not pay child support or the mortgage on the house during that year, Mrs. Mikovic had a roommate who paid rent, that he sent her $1,000 from the Slovakian government, and that she had profits from the sale of real estate the couple owned.

Mrs. Mikovic and MPM returned to Slovakia to visit Mr. Mikovic from July 28 until August 18, 2005 to celebrate MPM's first birthday.  During this trip, the couple resumed talks about living in an English-speaking country,  and visited the American Embassy in Prague seeking permission for Mr. Mikovic to return to the United States. Mr. Mikovic testified that "if I cannot go back to America we have to move somewhere else, make sure we are staying together."  They discussed the possibility of living in Great Britain, Canada, and Australia.

Mrs. Mikovic testified that at the time of MPM's birth, she and her husband discussed raising the child in the United States.  She testified that she  never intended to leave the U.S. or "for all this to happen.  I always wanted to remain in the U.S." Mr. Mikovic denies that he and his wife discussed his desire that MPM grow up in the United States.

In October 2005, Mr. Mikovic moved to Great Britain, where the English language is spoken and he had friends.  He testified that he had found a job in Wales

before making the move.  "So it was big - really good start for me. . . .  I came over here, went to work three months, prepare . . . for my wife and my son and then they follow me."  The couple discussed the move to Wales before Mr. Mikovic actually relocated there.

Mrs. Mikovic sold the couple's home in Jacksonville, which involved Mr. Mikovic signing over to her a power of attorney to make the sale, and all of their belongings, including MPM's crib.  Mrs. Mikovic said she had put the couple's home on the market in August 2005, before Mr. Mikovic moved to Wales, because of problems with it, and a contract was pending on the sale of the home on October 19, 2005.  "[H]e didn't ask me to go to the U.K. until after the fact that I had a buyer," according to Mrs. Mikovic. The home sale closed on December 30, 2005.[4]  Mr. Mikovic testified that "[s]he sell everything.  She sell my cars, my tools, our furniture.  Everything."  Mrs. Mikovic lived at a friend's house for about two weeks, and then drove to Pennsylvania to stay with Mr. Mikovic's aunt for about a month.[5]  Mr. Mikovic testified that the Jacksonville home was sold to allow Mrs. Mikovic and MPM to move to Wales.

Mrs. Mikovic testified she agreed to move to Wales so that MPM could be with

---

[4]   According to Mr. Mikovic, the couple made a $40,000 profit on the sale of a house and a $7,000 profit from the sale of a condominium.  Mrs. Mikovic said she used the proceeds to pay off bills she incurred during 2005, and to purchase certificates of deposits.  She took the remaining $10,000 with her to Wales.

[5]   Respondent's bank statement indicates that purchases were being made in Pennsylvania as of January 12, 2006.

his father and in hopes that the marriage would work. "I asked before I went if I wasn't happy there I could return. I was only going to see if things were going to work out." She said she never told Petitioner that she wanted to move the marital home to Wales. Mr. Mikovic denied that he told his wife that if she did not like Wales, she could return to the United States. "I say if she don't like it we can go somewhere else. . . . Why would I say that, I want to keep in touch with my son, I want to spend my time with him so why would I say that [she could return with MPM to the United States]."

Mrs. Mikovic and MPM arrived in Wales on January 25, 2006. She brought her clothes and $10,000 from the sale of the house, keeping nearly $6,900 in a bank account (as of February 12, 2006) in Pennsylvania (Respondent's Ex. 5) and purchasing a $20,000 certificate of deposit on January 11, 2006 in a Jacksonville account. (Petitioner's Ex. 28.)[6] Within days, the family moved into a rented house at 21 Locke Street, Newport, South Wales. They had a six-month lease that both signed. Likewise, utilities for the home were in both names. They shared a joint bank account, and Mrs. Mikovic had a credit card.

While in Wales, MPM was enrolled in day care, attending Kites Nursery School, and Mrs. Mikovic worked through a job placement agency. Though she prepared a

_____

[6]   The certificate of deposit is in the names of "Amy Mikovic" and "ITF Peter Mikovic."  (Petitioner's Ex. 28.)

resume focused on presenting her credentials as a dental hygienist, Mrs. Mikovic said she was unable to find a hygienist job in Newport.  According to Mr. Mikovic, his wife wished to wait until after their extended holiday trip to Slovakia to take a more permanent job.  Both Mrs. Mikovic and MPM registered for benefits with the National Health Service, receiving free medical care and medications while in Wales.

From April 2006 through September 2006, Mr. Mikovic worked a construction job 98 miles away in Aberystwyth, Wales during the weekdays, paying weekly rent and living with four other Slovakian workers, returning to the Newport home to spend weekends with Mrs. Mikovic and MPM (except on the few weekends when Mrs. Mikovic and MPM went to the beach community of Aberystwyth for the weekend). The couple together paid the bills on the Newport home.  Mr. Mikovic testified that though Mrs. Mikovic considered moving to Aberystwyth, she was unable to locate suitable day care there, and the couple decided to remain in Newport.  Mrs. Mikovic was upset about the fact that Mr. Mikovic was gone during the week, saying he knew "I wasn't happy with not having him around."

Mr. Mikovic introduced into evidence photographs of the apparently happy family taken on various weekend excursions and day trips, including a November 25, 2006 trip to Glascow, Scotland.  He also testified that his wife said she was happy in Wales.  She, however, paints a different picture, stating that they "argued most of the time" during these trips and that she told her husband that she was not happy in

Wales.

Next door neighbor Victor Baldwin testified from Wales that the Mikovics lived together in their 21 Locke Street home.  He said he was aware that Mr. Mikovic traveled to Aberystwyth to do construction work and that he returned to the Newport home on the weekends, sometimes Thursday night, Friday, or Saturday morning.  Mr. Baldwin said that he was not under the impression the couple was separated during this period.

Friend Michal Petruf testified from Wales that he socialized with the Mikovics several times, including in their Locke Street home, after he arrived in Wales in March 2006, and that the couple was living together there with MPM.  He confirmed that during the period when Peter Mikovic was working in Aberystwyth, he would stay the week in Aberystwyth and return to the couple's home in Newport for the weekends, usually on Friday night, sometimes Thursday night, and returning to Aberystwyth early Monday.

Mrs. Mikovic applied for residence documentation in Wales because "I didn't know how long I would be there, so I had to send these applications off to make sure that I didn't overstay my visitation time." On October 25, 2006, Mrs. Mikovic and MPM were issued a residence card (affixed to their passports) as family members of an "EEA National" (European Economic Area) which authorized them to remain in Wales until October 25, 2011.  (Petitioner's Exs. 26, 27.)  To obtain a passport to travel to

10

Slovakia for Christmas 2006, Mrs. Mikovic filed documentation with Slovakia (and received on January 2, 2007), certifying "that I am ending my permanent residence on the territory of the Slovak Republic for the reason of moving to Great Britain on 2nd January, 2007."  (Petitioner's Ex. 6.)[7]

On December 13, 2006, Mr. and Mrs. Mikovic met with mortgage broker David Bolton at their home in Newport.  Mr. Bolton was there "to give them mortgage advice with a view to them purchasing a property at some point," Mr. Bolton testified.  Mr. Bolton said he was contacted by Mr. Mikovic and that he and the couple discussed "their income, then we talked about the potential for them to obtain a mortgage in order to buy a property" as their "main residence."  Mr. Bolton said that there was "every chance" that they would be able to purchase a property based upon Mr. Mikovic's income as a builder and Mrs. Mikovic's capacity to earn as a part-time or full-time dental hygienist.  Mr. Mikovic testified that the couple planned to invest the proceeds from the sale of his deceased mother's house in Slovakia in property in Wales, to purchase a house and fix it up for a profit as they had done in the United States.  Mrs. Mikovic testified that her husband was interested in buying a "fixer upper," working on the house as an investment, and renting it to workers.  She said she did not want to live in Newport; "I wanted just a home for a family . . . . So we

---

[7]    Mrs. Mikovic's passport, which was turned into the clerk of the Court on August 21, 2007, pursuant to the Court's Order, bears a sticker on its cover identifying Amy Mikovic at the 21 Locke Street, Newport, Wales address.

talked to the mortgage broker what it would take to buy a home."  However, Mrs.

Mikovic testified that by the end of 2006, their marriage was "pretty much over" and

that they started discussing how to split up their money.  The Mikovics told Mr. Bolton

that they were going on a one-month holiday on December 15 to Slovakia and that

they would meet again when they got back, but they did not follow-up.

On December 15, 2006, the family traveled to Slovakia for the holidays.  While

in Slovakia, the couple argued because Mrs. Mikovic did not want to stay with Mr.

Mikovic's family; according to Mrs. Mikovic, they argued the "whole time" "because he

hadn't been spending time with the family."  Mrs. Mikovic checked into a hotel where

she stayed one night by herself, and Mr. Mikovic and MPM had Christmas dinner with

Mr. Mikovic's family.  After that, Mr. Mikovic stayed in the hotel with his wife, and MPM

stayed with Mr. Mikovic's sister for most of the trip.

One reason for the trip was to obtain the £14,000 cash from the sale of Mr.

Mikovic's mother's house because, according to Mr. Mikovic, Mrs. Mikovic was

"scared to transfer . . .  from the bank to the bank so we have to go to Slovakia and

get the cash and bring it over here and then we talk to David Bolton and we could buy

a house but that thing never happened."[8]

Returning to Wales on January 4, 2007, Mrs. Mikovic said that she told her

_____

[8]     Mr. Mikovic had earlier acquired £6,000 from the sale of the house in Slovakia
which had been used to purchase an automobile for the family.

husband she wanted to go to the United States permanently and asked how much money she could take with her.  She said that Mr. Mikovic responded that she could take back the $10,000 that she brought, which she thought was not a fair amount given the amount of her funds she had spent on the marriage.  Mr. Mikovic conceded that in January 2007, he offered to give Mrs. Mikovic £6,000 pounds to go back to the United States "for two months," based on the fact that she had brought $10,000 with her from the United States to Wales, but that he did not ultimately give her the money. Mrs. Mikovic denies that she told her husband that she planned to return to Wales after two months.

On January 12, 2007, Mr. Mikovic threatened to report to the Wales social services that Mrs. Mikovic had been mistreating MPM as a way to keep her in Wales. Mrs. Mikovic testified that the threat "scared" her and that she immediately went to the day care to pick up MPM.  She told the day care personnel that she was upset because her husband was trying to falsely accuse her of bruising MPM and had threatened that he was going to call social services and the police.  The nursery became concerned and called social services.  According to the police report, Mrs. Mikovic told the nursery she was taking MPM to a hotel for now and then back to the United States.  The nursery reported to police that Mr. Mikovic had informed it on the preceding day, January 11, that MPM would be attending nursery until the end of the

month.[9]   Mr. Mikovic told the police officer that Mrs. Mikovic was returning to the United States for two months to take care of her grandmother, and, according to the police report (Respondent's Ex. 6), "Peter actually agreed also that he had said that sort of thin [sic] [making false reports about bruising] in the past to keep Amy at home."  A police officer found Mrs. Mikovic at a hotel and inspected MPM for bruises, finding none.   The police report describes Mrs. Mikovic as "frantic and extremely upset," and said that she stated that it was her intention to leave her husband.

Mr. Mikovic explained his false accusation as follows:

> I had an argument with Amy.  She say I'm leaving, United States.  I say why.  I'm going to see my grandmother.  I say don't take [MPM] with you I say you will make something - make bruises.  But after I say it with the argument - after I say it, I take it back.  Okay.  I don't mean it.  So I don't mean to say it.  But, you know, you say it - you don't mean it.  I take it back.  You take it back.  But she take it so serious and she go to the nursery and she start running from that point.
>                                    . . .
>
> There was the argument I say you can go but leave [MPM] here you go for two months take care of the grandmother it be easy to you to do that without [MPM], but yeah, after - after - she promised and swear she go for two months and come back, yeah, I was okay she can go with [MPM], my son.

He said "maybe" and then denied that he had threatened "falsehoods" before during

_____

[9]    A total of £330 was paid in advance to the Kites Nursery School for MPM's day care costs for the month of January 2007.

arguments to keep Mrs. Mikovic in Wales "but I said I don't mean it.  I take it back."

Social Services called Mr. Mikovic to confirm that Mrs. Mikovic had his consent to leave for the United States with MPM and Mr. Mikovic responded: "But she tell me she going to America take care of her grandmother for two months and she come back."  "[S]he swear to God she go for two months to America and come back."  Mrs. Mikovic said she has no idea why he said that he had consented only to a two month trip.  After Mr. Mikovic spoke with the social services workers, he attempted to contact Mrs. Mikovic who did not answer the phone.  After 24 hours with no contact, Mr. Mikovic reported her missing to police.  He subsequently learned she had left for the United States.

Mrs. Mikovic left Wales with MPM on January 13, 2007, taking with her between £14,000 and £15,000 from the sale of the Mikovic house in Slovakia. According to Mr. Mikovic, Mrs. Mikovic did not take any of her records; "she left everything."  Mrs. Mikovic moved into her current Jacksonville address in February 2007.

Mr. Mikovic testified he began searching for MPM immediately, and that he never consented to Mrs. Mikovic taking MPM back to the United States forever.  He said he had no information about the whereabouts of MPM for over two months.  After that, Mrs. Mikovic gave her telephone number to Mr. Mikovic's aunt in Pennsylvania, and he was able to call.  After Mrs. Mikovic returned to the United States, Mr. Mikovic

15

forwarded immigration paperwork to her and she and Petitioner's aunt filed papers attempting to secure his entry into the country.  He testified that though he would prefer to live in Wales because it is closer to his family in Slovakia and it is "European," he is still attempting to come to the United States because it would make his wife happy to live here, and that the happiness of living with his wife and son would be worth the compromise.

Mrs. Mikovic said that Mr. Mikovic agreed that she could return to the United States if she was not happy in Wales, and that he consented to her leaving Wales with MPM. "[W]e had mutually come to a decision that our marriage was over and that I was taking [MPM] and going to the U.S.," she said.  She contends that Mr. Mikovic brought this action because he was upset about her taking the money from the sale of his mother's home.  Mr. Mikovic denies both statements.

On March 16, 2007, Mr. Mikovic, in accordance with the Hague Convention, filed an application with the Central Authority of England and Wales for the return of MPM, which in turn applied to the United States' Central Authority.  (Docs. 1 at ¶ 27; 1-3 at 7.)  Divorce proceedings have not yet begun in Wales, although the paperwork is being prepared.  (Doc. 1 at ¶ 28.)  Mrs. Mikovic is living in Jacksonville with MPM and is working part time as a dental hygienist and assistant; MPM is attending day care in Jacksonville.  Mrs. Mikovic has filed for divorce and custody of MPM in the Florida state court in Jacksonville.

16

Petitioner, Peter Mikovic, argues that under the Convention and ICARA,  Amy Mikovic wrongfully abducted MPM from his habitual residence in Wales and retained the child in the United States.  Respondent Mrs. Mikovic contends that the child's habitual residence is and always has been the United States and, in the alternative, that the Petitioner acquiesced and consented to the child's residency in the United States.

## II.   Course of Proceedings

This matter commenced on July 31, 2007, when Petitioner filed a verified petition pursuant to the Hague Convention, motion for preliminary injunction, and motion for temporary restraining order.  (Docs. 1, 2, 3.)  On August 1, 2007, the Court entered a Temporary Restraining Order enjoining Respondent from removing or sending MPM outside of the jurisdiction of this Court during the pendency of this case.[10]  Eventually, in lieu of entering a preliminary injunction, the Court entered an Order in which Respondent (now represented by counsel) stipulated to keeping MPM within the jurisdiction of this Court pending the final decision on the Petition.

## III.   Applicable Law

"The Hague Convention was enacted to "'secure the prompt return of children

_____

[10]   Pursuant to ICARA, a court "may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the child's further removal or concealment before the final disposition of the petition."  42 U.S.C. § 11604(a).

wrongfully removed to or retained in any Contracting State'" and to "ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'"  Ruiz v. Tenorio, 392 F.3d 1247, 1250 (11th Cir. 2004)(quoting Hague Convention, art. 1, T.I.A.S. No. 11,670, at 4).  The Hague Convention, implemented by ICARA, entitles a person whose child has been wrongfully removed to, or wrongfully retained in, the United States to petition the federal court in the place where the child is located, to order the child returned.  42 U.S.C. § 11603(b); see Ruiz, 392 F.3d at 1250.  The Hague Convention seeks to protect children from the harmful effects of international parental child abduction by establishing civil procedures to ensure that abducted children are promptly returned to the country of their "habitual residence."  Hague Convention, Preamble.  "The Convention is designed to restore the pre-abduction status quo and to deter parents from crossing international borders in search of a more sympathetic forum," Furnes v. Reeves, 362 F.3d 702, 710 (11th Cir. 2004), as well as to "protect the legal rights of the non-abducting parent."  Dallemagne v. Dallemagne (In re D.D.), 440 F. Supp.2d 1283, 1292 (M.D. Fla. 2006)(citing Ruiz, 392 F.3d at 1250); Lops v. Lops, 140 F.3d 927, 935-36 (11th Cir. 1998).

    "A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."  Hague Convention, art. 19.  "A court considering an ICARA petition has jurisdiction to decide

the merits only of the wrongful removal claim, not of any of the underlying custody dispute." Lops, 140 F.3d at 936. "The underlying premise of the Hague Convention is that a child's country of habitual residence is the place where decisions relating to custody and access are best decided." Garcia v. Angarita, 440 F. Supp.2d 1364,1378 (S.D. Fla. 2006).

Mr. Mikovic, as Petitioner, bears the initial burden of proving by a preponderance of the evidence "that the child has been wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1)(A); see also Ruiz, 392 F.3d at 1251. To establish a prima facie case of wrongful removal or retention, Mr. Mikovic must establish by the preponderance of the evidence: (1) that MPM was a "habitual resident" of Wales immediately before the date Mrs. Mikovic removed MPM to the United States in January 2007; (2) that the removal or retention was in breach of petitioner's custody rights under the law of Wales as the child's habitual residence; (3) that he had been actually exercising or would have been exercising custody rights concerning the child at the time of the child's removal or retention; and (4) the child has not attained the age of 16. Ruiz, 392 F.3d at 1251; Dallemagne, 140 F. Supp.2d at 1293. "If petitioner meets this burden, the child who is wrongfully removed or retained must be promptly returned." Dallemagne, 440 F. Supp.2d at 1293 (citing Lops, 140 F.3d at 936; 42 U.S.C. § 11601(a)(4)).

The parties agree that Mr. Mikovic satisfies the last three elements of

19

establishing wrongful removal under the Hague Convention, that is, that Mr. Mikovic had custody rights pursuant to the law of the United Kingdom, that under that law, he was exercising his custody rights at the time of MPM's removal, and that MPM is under the age of 16.  See Dallemagne 440 F. Supp.2d at 1293-94.  The disputed issue is whether MPM was a "habitual resident" of Wales in January 2007 when Mrs. Mikovic removed him to the United States.

If Mr. Mikovic is able to satisfy his burden of establishing wrongful removal, MPM must be returned to the United Kingdom unless Mrs. Mikovic can establish one of six available affirmative defenses.  Lops, 140 F.3d at 945; see 42 U.S.C. § 11603(e)(2)(A) and (B).  The parties agree that the only affirmative defense applicable to this case is whether, in the event MPM's "habitual residence" is determined to be Wales, Mr. Mikovic nevertheless consented to MPM's removal to the United States. This defense must be proven by the respondent, Mrs. Mikovic, by the preponderance of the evidence.

### A.   Habitual Residence

The interpretation of "habitual residence" is vitally important to the Convention because it will dictate the arbiter of the custody dispute.  However, neither the Hague Convention nor ICARA actually define the term "habitual residence."  Ruiz, 392 F.3d at 1252.

The Eleventh Circuit in Ruiz, has set forth the analytical framework for

determining "habitual residence."  "The first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind."  Ruiz, 392 F.3d at 1252 (citing Mozes v. Mozes, 239 F.3d 1067, 1075 (9th Cir. 2001)).  "[W]hen an alleged abandonment of a clearly established habitual residence for a new home is at issue, the court must determine not only whether the child was settled in his new home, but whether the prior habitual residence was abandoned, and the new home has supplanted the old 'as the locus of the [child's] family and social development.'" Small v. Clark, No. 5:06-CV-125-OC-10GRJ, 2006 WL 2024955, at *4 (M.D. Fla. July 17, 2006)(unpublished opinion)(quoting Mozes, 239 F.3d at 1084).  "It is not necessary to have this settled intention at the time of departure, as it could develop during the course of a stay originally intended to be temporary."  Ruiz, 392 F.3d at 1252 (citing Mozes, 239 F.3d at 1075); see also Dallemagne, 440 F. Supp.2d at 1294. The determination of this "subjective" settled intent is important "because there can be no bright line rule with respect to the length of an absence."  Ruiz, 392 F.3d at 1253.  "'All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled.'" Ruiz, 392 F.3d at 1252 (quoting In re Bates, No. CA 122.89 at 9-10, High Court of Justice, Fam.Div'n Ct.Royal Court of Justice, United Kingdom (1989)).

Because a young child (such as three year old MPM) does not usually have a "settled intent" independent of his or her parents, a court should look to "the settled

21

purpose and shared intent of the child's parents in choosing a particular habitual residence." Whiting v. Krassner, 391 F.3d 540, 550 (3d Cir. 2004); see also Ruiz, 392 F.3d at 1253. "The shared intentions of both parents for a child to establish a residence at a particular location, coupled with actions to establish the residence, may create a new habitual residence within a short time period." Samholt v. Samholt, No. 1:06CV00407, 2006 WL 2128061, at *2 (M.D.N.C. July 26, 2006)(unpublished opinion)(citing Feder v. Evans-Feder, 63 F.3d 217, 224-23 (3d Cir. 1995) and Humphrey v. Humphrey, 434 F.3d 243, 248 (4ᵗʰ Cir. 2006)).   Importantly, the emphasis is on the *shared intentions of both parents* rather than unilateral intentions of one parent.   Samholt, 2006 WL 2128061, at * 2 (citing Feder, 63 F.3d at 224)(emphasis added).  "Because the Convention tries to prevent one parent from unilaterally determining the country in which the child will live, the habitual residence of the child cannot be shifted without mutual agreement. [Citation omitted].  Moreover, courts have generally refused to find that the changed intentions of one parent shifted the child's habitual residence." In re Ahumada Cabrera, 323 F. Supp.2d 1303, 1311 (S.D. Fla. 2004)(citing Mozes, 239 F.3d at 1077).

The Eleventh Circuit in Ruiz described three categories of "difficult cases [that] arise when the persons entitled to fix the child's residence do not agree on where it has been fixed": "(1) where the court finds a shared settled purpose, despite one parent having 'had qualms about the move,' and where there is a finding that the

'family has jointly taken all the steps associated with abandoning habitual residence in one country to take it up in another; . . . (2) cases where the 'initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period,'" [citation omitted]; and (3) "cases 'where the petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous duration.'"

Ruiz, 392 F.3d at 1253 (quoting Mozes, 239 F.3d at 1076-77).

> "Sometimes the circumstances surrounding the child's stay are such that despite the lack of perfect consensus, [a court may find] the parents to have shared a settled mutual intent that the stay last indefinitely.  When this is the case, we can reasonably infer a mutual abandonment of the child's prior habitual residence.  Other times, however, circumstances are such that, even though the exact length of the stay was left open to negotiation, the court is able to find no settled mutual intent from which such abandonment can be inferred."

Ruiz, 392 F.3d at 1253 (quoting Mozes, 239 F.3d at 1077-78).

In addition to the settled intention of the parents, for there to be a relocation of the habitual residence, "there must be an actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized." Ruiz, 392 F.3d at 1253.  However, such indicators of "acclimatization", such as doing well with school and friends, see Ruiz, 392 F.3d at 1253-54, are not a significant factor when, as here, the child removed was younger than three years old.  See Yocom v. Yocom, No. 6:05CV590ORL28DAB, 2005 WL 1863422, at *5 (M.D. Fla. Aug. 5, 2005) (unpublished opinion)(in the case of a very young child,

"'acclimatization is not nearly as important as the settled purpose and shared intent of the child's parents in choosing a particular habitual residence'")(citation omitted).

Finally, "when there is no shared settled intent on the part of the parents to abandon the child's prior habitual residence, a court should find a change in habitual residence if the objective facts point unequivocally to a new habitual residence . . . ." Ruiz, 392 F.3d at 1254. The determination of "habitual residency" is a mixed question of fact and law.  Ruiz, 392 F.3d at 1251-52.  The Court is faced with a fact-intensive inquiry, which culminates in a legal determination of habitual residency.[11]

### 1.    Cases in Which Prior Habitual Residence Held Not Abandoned

Applying these precepts to the facts of the case, the court in Ruiz concluded that, though a "close case,"  the petitioner in that case, the father, had failed to prove that his children's prior United States habitual residence had been abandoned and a new habitual residence established in Mexico.  The court affirmed the district court's finding that the mother and the father "never had a shared intention to abandon the prior United States residence and to make Mexico the habitual residence of their children."  The district court had found that the parents "agreed to move to Mexico for a trial period", crediting the testimony of the mother's mother that the father "had

---

[11]  "In this capacity,  the  judge's function includes weighing the evidence, evaluating the credibility of witnesses, and deciding questions of fact, as well as issues of law." Small, 2006 WL 2024955, at * 3 (citing Childrey v. Bennett, 997 F.2d 830, 834 (11th Cir. 1993))

promised that if it did not work out in Mexico, they would come back to the United States." 392 F.3d at 1254, 1257, 1258-60.  Further, the district court determined that the mother was a United States citizen whose "intent with respect to the move to Mexico was clearly conditional."   The district court considered objective facts indicating the mother's lack of intention to move permanently to Mexico, including retaining bank accounts and credit cards in the United States; forwarding mail to an American address; and moving her nursing license to Florida shortly after moving to Mexico.  Furthermore, the district court found that the father's intent to remain in Mexico was ambiguous, based upon his exploration of job opportunities in the United States, and maintenance of contact with friends in the United States.  392 F.3d at 1254-55.  The mother's "intention with respect to the move to Mexico was clearly conditional upon improvements in their marriage, was expressed and in the open," and known to the father who promised the mother's family that they would return to the United States if Mexico did not work out.  392 F.3d at 1257 (contrasting the case Feder, 63 F.3d at 224 and observing that though the mother in Feder was ambivalent about the family's move to Australia: "the extent to which she made her reservations known and the timing thereof is less clear, and there is no suggestion that she exacted a promise to return if things did not work out").

Finding no shared and settled intention of the parents to abandon the previous United States habitual residence of the children, the Ruiz court then examined

25

objective facts to determine whether they pointed unequivocally to an abandonment of habitual residence from the United States to Mexico.  The fact that the children "remained in Mexico for a considerable period of time" (two years and ten months), that "there was some evidence of their acclimatization," that the father undertook employment in Mexico, and that a house was being built for the family tended to show a change of habitual residence.  These facts were counterbalanced by other objective evidence that the move was intended to be conditional, including the fact that the father's family in Mexico "appears to have been in control of the family's destiny," financing the move to Mexico, the new house, and providing the father's employment. Further, the father was having difficulties with his brother and employment situation, drinking, and experiencing marital problems.  He was exploring employment in the United States and the mother maintained her nursing license in Florida and financial ties with the United States.  Additionally, the mother and children went to Mexico on tourist visas, and there is no evidence that they sought to acquire permanent legal status or Mexican citizenship for the mother and children. 392 F.3d at 1255.  "[T]he husband promised a conditional stay, i.e. one that could be terminated if it did not work out. . . . [A]ttempts to salvage the marriage, rather than commitment to staying in the new locale [is] what determined the length of stay . . . ."  Ruiz, 392 F.3d at 1258-59.  On this basis, "the district court made a finding of fact that the family was in limbo during its stay in Mexico," id. at 1255, and that the children's habitual

residence was the United States.  See also Papakosmas v. Papakosmas, 483 F.3d 617, 625-26 (9th Cir. 2007)(citing both Mozes and Ruiz, and affirming denial of a father's Hague Convention petition to return the children from the United States to Greece, the court determined that based on the facts of the case, the couple's four month turbulent stay in Greece was "conditional" and that the children's - ages 6 and 8 - habitual residence had not changed from the United States to Greece); Gitter v. Gitter, 396 F.3d 124, 135 (2d Cir. 2005)(though petitioner father adduced evidence of "some indicators tending to suggest [the family's] stay in Israel might be of indefinite duration," the district court's determination crediting the mother's testimony that the couple "'only mutually agreed to move to Israel on a conditional basis - namely, that Mrs. Gitter would be satisfied with the new arrangements'" - was not clearly erroneous); Holder v. Holder, 392 F.3d 1009, 1017-19 (9th Cir. 2004)(citing Mozes and Ruiz, holding that children who resided for eight months with their parents on military base in Germany where father was stationed were habitual residents of the United States; though parents differed on their settled intent, court concluded in a "close case" that father's 48 month "tour length" was another temporary assignment).

## 2.    Cases In Which Prior Habitual Residence Held Abandoned

Petitioner relies upon the case Feder v. Evans-Feder, 63 F.3d 217 (3d Cir. 1995) in which the court determined that a four-year old's move from the United States and six month stay in Australia with his married parents, both United States

citizens, established an intent to abandon the United States in favor of Australia as

the child's habitual residence.  In <u>Feder</u>, the child was born in Germany; moved to the

United States with his parents at the age of three months where he lived for three

years and nine months; and then moved with his parents to Australia where his father

secured an executive position.  His mother remained reluctant to move to Australia

and testified she did so "intending to work toward salvaging her marriage," which had

been deteriorating.  <u>Feder</u>, 63 F.3d at 219.  The mother returned to the United States

with the four year old son after six months in Australia.   On the father's Hague

Convention petition, the court, reversing the finding of the district court, stated:

> Although Mr. and Mrs. Feder viewed Australia very differently, both agreed to move to the country and live there with one another and their son, and did what parents intent on making a new home for themselves and their child do - they purchased and renovated a house, pursued interests and employment, and arranged for [the child's] immediate and long-term schooling [as well as obtained Australia Medicare cards giving them access to the country's health care system].  That Mrs. Feder did not intend to remain in Australia permanently and believed that she would leave if her marriage did not improve does not void the couple's settled purpose to live as a family in the place where Mr. Feder had found work.

<u>Feder</u>, 63 F.3d at 224.

The Eleventh Circuit in <u>Ruiz</u> distinguished the <u>Feder</u> case at length.  First, the

court in <u>Ruiz</u> affirmed the district court's finding of fact that there was no shared intent

to abandon the United States as the habitual residence and to take up residence in

28

Mexico. <u>Ruiz</u>, 392 F.3d at 1256-57 & n.5 (noting that it is not clear whether the district court made a finding of fact in <u>Feder</u> with respect to the shared intent of the couple's to move to Australia).  The <u>Ruiz</u> court also distinguished <u>Feder</u> on the basis that in <u>Ruiz</u>, 1) no one attempted to obtain  permanent residency for the wife and children in Mexico; 2) the father's job in Mexico was unsatisfactory and he was exploring employment opportunities in the United States; and 3) the <u>Ruiz</u> couple's home in Mexico was the work of the husband's father, not their own initiative. <u>Ruiz</u>, 392 F.3d at 1258.

In reaching a decision in this case, the Court has also considered additional authority finding that a prior habitual residence had been abandoned.  <u>See</u> <u>Koch v. Koch</u>, 450 F.3d 703, 715-17 (7th Cir. 2006)(move to Germany was of a settled nature where parents shared intention to move to Germany for indeterminate period of time, with subjective wish to return someday to the United States); <u>Dallemagne</u>, 440 F. Supp.2d at 1294 (though testimony did not establish that parents had an initial settled intent to abandon the United States as a place of habitual residence and make France their habitual residence, "there developed an implicit shared intent to establish France as the place of habitual residence for petitioner, respondent, and the child"); <u>Yocom</u>, 2005 WL 1863422, at *5 (parties agreed to move from the United States to Germany to live for the 42 months that father was assigned by military there, and intended that Germany be place of residence for at least that period of time).

IV.     **The Court's Decision**

The Court draws two main lessons from a review of these precedents.  First, the Circuits are not unanimous in their approach to determining the issue of "habitual residence."[12]  Of course, this Court is bound by the Eleventh Circuit's decision in Ruiz.  Second, each of these cases is fact-intensive, often depending on difficult credibility determinations and conflicting facts which require looking at the "totality of the circumstances."

This case could plausibly be viewed through two different lenses.  The Court could look at the issue of "habitual residence" from the narrow "micro" view of the activities of the parties during the period in which Mr. Mikovic first moved to Wales and Mrs. Mikovic and MPM left the United States for Wales on January 25, 2006, until mother and child returned from Wales to the United States on January 13, 2007.  Or, the Court could look at the "macro" view of how MPM's time in Wales fits within the bigger picture of the history of this couple and their child.  The Court finds the "macro" view to be the more appropriate framework - a framework supported by the Eleventh Circuit's decision in Ruiz.

Under Ruiz, the Eleventh Circuit requires this Court to determine whether the

---

[12]    The Sixth Circuit in the recent case Robert v. Tesson, ___F.3d ___, 2007 WL 3354019 (6th Cir. Nov. 14, 2007) recognized that there is a Circuit split with regard to the weight to be given to the intention of the parents when determining the habitual residence of a child, and disagreed with the Eleventh Circuit's approach in Ruiz.

Mikovics and their child acquired a new habitual residence by "forming a settled intention to abandon the one left behind."  Ruiz, 392 F.3d at 1252.  The parties here both agree that on January 25, 2006, the date that Mrs. Mikovic and MPM first traveled to Wales, the United States was the child's habitual residence.  Thus, the question is whether the Mikovics at that time, or at any time thereafter, shared an intent and mutually agreed to abandon the United States as MPM's habitual residence and whether their residence in Wales "had a sufficient degree of continuity to be properly described as settled."  Ruiz 392 F.3d at 1252.

Obviously, Mr. and Mrs. Mikovic disagree on whether they shared an intent to shift MPM's habitual residence from the United States to Wales.  Mrs. Mikovic testified that the couple was separated for the entire year of 2005 when she and MPM lived in Jacksonville (with Mr. Mikovic's consent) and Mr. Mikovic lived in Slovakia and Wales and that she was only intending to move to Wales "for a trial period" in an effort to make the marriage work.  She states that Mr. Mikovic promised that if she did not like living in Wales, she and MPM could move back to the United States.  Mr. Mikovic denies that he ever promised that Mrs. Mikovic and MPM could move back to the United States if things did not work out in Wales, but rather said that they could all move to another English speaking country.  He contends that the couple was not separated during 2005, that they spoke about living together in an English speaking country and that upon his finding a job and a home in Wales, they agreed to live in

31

Wales as a family.

To evaluate this disparity, the Court first looks at the prior history of the couple and their child.  Mrs. Mikovic is an American citizen who had lived in the United States all of her life.  When Mr. and Mrs. Mikovic married in Jacksonville, Florida, during 2002, Mrs. Mikovic did know that he was an illegal alien.  She did not know (neither possibly did Mr. Mikovic) that he had already been deported *in absentia* in 1999.  At the end of 2002, the couple bought a house in Jacksonville and Mrs. Mikovic filed a petition on her husband's behalf seeking permission for him to reapply for admission to the United States.  However, Mr. Mikovic was jailed and then deported in June 2003, all while Mrs. Mikovic was working (and spending $15,000 on lawyer's fees) to correct her husband's legal status and allow him to remain in the United States.

Once deported, Mr. Mikovic moved back to his home country of Slovakia, having been told he was not eligible to re-enter the United States until 2013.  In 2003, Mrs. Mikovic traveled to Slovakia twice, once for almost five months, to be with her husband.  However, when she became pregnant she returned to Jacksonville, as the couple had agreed that their child should be an American citizen.  During the seven months that she remained in the United States, MPM was born and she continued to file paperwork trying to have her husband legally re-enter the United States.

On October 16, 2004, Mrs. Mikovic and MPM traveled to Slovakia but she was unhappy there.  Morever, the couple was having marital problems and the

preponderance of the evidence established that when Mrs. Mikovic and MPM left

Slovakia on January 15, 2005 and returned to Jacksonville, it was with Mr. Mikovic's

consent and with the understanding that the marriage might very well be over and

there were no plans for Mrs. Mikovic and MPM to move again outside of the United

States.

Thus, as of January 2005, when Mrs. Mikovic and MPM moved back to the

United States, where she resumed her life in Jacksonville, working part-time and

paying the mortgage on the house, it was clear that Mrs. Mikovic and MPM were not

going to live in Slovakia, that, although the couple had discussed the possibility of

moving to another English speaking country (other than the United States), they had

made no plans to do so and that they were still working on having Mr. Mikovic gain

re-entry to the United States.

Except for a three week trip to Slovakia to visit Mr. Mikovic in July and August

of 2005, Mrs. Mikovic and MPM resided in Jacksonville beginning January 15, 2005

until they traveled to Wales a year later.  From January 2005 until October of 2005,

Mr. Mikovic continued to reside in Slovakia.  It was not until October 2005 that Mr.

Mikovic moved to Wales; this was Mr. Mikovic's first connection to Wales.  During this

time, he and Mrs. Mikovic were discussing whether she would agree to move to

Wales.  Ultimately, she did so in January 2006, after selling the family home and most

of their possessions.  She did, however, leave bank deposits and a certificate of

deposit in the United States.

Mr. Mikovic portrays the move to Wales as part of a long standing plan the couple had to move to an English speaking country.  Mrs. Mikovic testified differently, saying she moved to Wales so that MPM could be with his father and in the hopes that the marriage could be saved but that she was only going to "see if things were going to work out."  Because the testimony of Mr. and Mrs. Mikovic is divergent on so many key points, the Court must make a credibility determination.  Both of them were obviously emotional and each "shaded" their testimony toward their own self-interest. Moreover, each had some inconsistencies in their stories.  However, based on my overall evaluation of their respective testimonies - their demeanor, their responsiveness to questions, the explanations for their inconsistencies - I judge Mrs. Mikovic overall to be more credible than Mr. Mikovic.  This decision is not based on but is bolstered by the deceptive lengths to which Mr. Mikovic admittedly was willing to go to force Mrs. Mikovic to remain in Wales: he was prepared to falsely accuse her of child abuse.  And, according to the police report, Mr. Mikovic said that he had threatened to do the same thing in the past.  (Respondent's Ex. 6.)[13]

Given the Court's credibility determination and the history just recited, the Court

_____

[13]   In fairness, while Mr. Mikovic did not deny saying these things, he did testify that it was in the heat of argument, and that he "didn't mean it," and that he "took it back."  Nevertheless, Mrs. Mikovic took it seriously enough that she reported Mr. Mikovic's remarks to her day care center, which in turn reported them to social services, leading to a police investigation.

finds that Mr. Mikovic has failed to prove by a preponderance of the evidence that he and Mrs. Mikovic had a shared intention to abandon the United States as MPM's habitual residence and to establish that habitual residence in Wales on January 25, 2006, the date on which Mrs. Mikovic and MPM first arrived in Wales.  The Court credits Mrs. Mikovic's testimony that she agreed to move to Wales only on a trial basis.[14]  While Mr. Mikovic denies that he told Mrs. Mikovic that if she did not like Wales she could return to the United States, even his own testimony does not support a finding of shared mutual intent to establish Wales as MPM's habitual residence.  Mr. Mikovic testified that he did agree that if Mrs. Mikovic did not like Wales, they would look for another "English speaking country" in which to live.  He also acknowledged that he agreed that Mrs. Mikovic and MPM could go back to the United States "for two months."  At best for Mr. Mikovic, the evidence showed a shared mutual intent to try Wales as a place to live with an understanding that they would move somewhere else if Wales was not satisfactory and that Mrs. Mikovic and MPM could go back to the United States, but not permanently.  See Ruiz, 392 F.3d at 1257 (husband's "own intention to abandon habitual residence in United States and take up habitual residence in Mexico was at least ambiguous").

Given Mr. Mikovic's lack of ties to Wales, his relatively short tenure there at the

---

[14]  Admittedly, it would have been preferable to have some corroborating testimony from another witness concerning Mrs. Mikovic's intentions (as there was in Ruiz).  However, I still found her more credible than Mr. Mikovic on this key point.

time of Mrs. Mikovic's move, Mrs. Mikovic's lack of connection to Wales and stated reservations about the move and the conditional nature of it, the prior history which established the United States as MPM's habitual residence (interrupted by an unsuccessful attempt to live in Slovakia) and Mr. Mikovic's acknowledgment that he understood that if the living situation in Wales proved unacceptable to Mrs. Mikovic that she and MPM would not be staying in Wales, the Court finds that Mr. Mikovic has failed to prove an abandonment of MPM's United States habitual residence in favor of Wales as of the date of the move.

Although the underlying facts in the Eleventh Circuit's <u>Ruiz</u> decision are somewhat different, this Court echos the language of <u>Ruiz</u> in finding that a preponderance of the evidence shows that Mrs. Mikovic agreed to move to Wales "for a trial period" and that Mr. Mikovic had promised her that if things did not work out, she could come back to the United States. <u>Ruiz,</u> 392 F.3d at 1254, 1258-60. This Court further finds that Mrs. Mikovic's decision to go to Wales was "clearly conditional" and that "attempts to salvage the marriage, rather than commitment to staying in the new locale [was] what determined the length of stay . . . ." <u>Id</u>. at 1254, 1258-59.

The Court is aware that the "settled intention" of the parents may be developed over time: "[i]t is not necessary to have the settled intention at the time of departure [from the U.S.] as it could develop during the course of the stay [in Wales] originally intended to be temporary." <u>Id</u>. at 1252.  However, the Court does not find this to be

such a case.  The Court credits Mrs. Mikovic's testimony that, while the couple was

in Wales, Mr. Mikovic was gone much of the time, that she was not "happy with not

having him around", that they argued much of the time and that she was dissatisfied

living in Wales.  Id. at 1253 ("circumstances are such that, even though the exact

length of the stay was left open to negotiation, the court is able to find no settled

mutual intent from which . . . abandonment can be inferred").

     "[I]n the absence of settled parental intent" to abandon the habitual residence

of the United States in favor of Wales, the Court "should be slow to infer from such

contacts [in Wales] that an earlier habitual residence has been abandoned."  Id. at

1255 (quoting Mozes, 239 F.3d at 1079).  "[W]hen there is no shared settled intent on

the part of the parents to abandon the child's prior habitual residence, a court should

find a change in habitual residence if the objective facts point unequivocally to a new

habitual residence . . . ."  Ruiz, 392 F.3d at 1254 (emphasis added).  Alternatively, the

Court may find abandonment if it can "'say with confidence that the child's relative

attachments to the two countries have changed to the point where requiring a return

to the original forum would now be tantamount to taking the child out of the family and

social environment in which its life has developed.'"  Id. at 1254 (quoting Mozes, 239

F.3d at 1081).

     Looking at the "objective facts," while the length of MPM's stay in Wales was

significant, almost one year, it is not decisive.  Indeed, the children in Ruiz stayed in

37

Mexico for two years, 10 months, and the Eleventh Circuit nevertheless agreed that the children's habitual residence remained the United States.  Thus, the length of stay is but one factor to consider.

Many of the other "objective facts" upon which petitioner relies are not particularly persuasive because they would apply to any family moving to another country, even on a trial or conditional basis.  For example, that MPM was enrolled in daycare, that Mrs. Mikovic found part-time employment (although of relatively short duration), that she maintained a joint account with her husband in Wales, had a credit card there, had her name on the electric and phone bills and the like do not add much to the analysis.

However, there are significant factors supporting petitioner's position that are more difficult to ignore.  For example, although the circumstances are disputed, Mrs. Mikovic did sell the couple's house in Jacksonville as well as their furniture and cars, and entered into a six-month lease in Wales in a house in which she resided with Mr. Mikovic and MPM.[15]  Moreover, Mrs. Mikovic and MPM applied for and were accepted to participate in the National Health Service in Wales, receiving free medical care and medications paid for by the British government.[16]  She also sought an extended

[15]   Mrs. Mikovic did retain assets in a bank account and a certificate of deposit in the United States.

[16]   Though she did not admit it in evidence or question Mrs. Mikovic about it, counsel for Petitioner presented National Health Service eligibility information

residency status for herself and MPM on October 25, 2006, though she offered a plausible explanation for this.[17]  She, at Mr. Mikovic's request, met with a realtor on December 13, 2006 to discuss the purchase of a residence in Wales (though no purchase was made).  She attempted to obtain a passport to travel to Slovakia at Christmas 2006 by filing documentation stating that she was ending her "permanent residence on the territory of the Slovak Republic for the reason of moving to Great

---

materials during closing argument, which the Court makes part of the record as Court Exhibits 1 and 2.  An overseas visitor to the UK may be eligible to receive the health service benefit if deemed to be an "ordinary resident" of the UK, which means "living in the UK voluntarily for a settled purpose as part of the regular order of his or her life for the time being" with "an identifiable purpose for his or her residence here and that purpose must have a sufficient degree of continuity to be properly described as settled.  It is unlikely that anyone coming to live in the UK, intending to stay for less than 6 months, will fulfill these criteria."  (Ct. Ex. 1 at 6 (Health Service Circular, HSC 1999/018 (Feb. 1, 1999).)  Also submitted by Petitioner's counsel was a printed flyer entitled "NHS Wales", bearing the name of the Welsh Assembly Government, and the title "Are you visiting the United Kingdom (Wales)?"  (Court Exhibit 2.)  The flyer lists those visitors who are eligible to receive "Full NHS Hospital Treatment" as including: "Anyone who has come to live permanently in the UK" and "[t]he husband or wife and any dependent children of anyone who is exempt under the above criteria [including "[a]nyone who is a national of an EEA member state" which includes Slovakia], if they are living permanently with the exempt person.  Coming to visit for a few weeks or months does not give exemption."  (Ct. Ex. 2 at 3-4.)  While some of the language in these documents supports Petitioner's position and other language does not, there was no testimony about why Mrs. Mikovic sought to participate in the National Health Service and whether it signaled an intention to become "settled" in Wales.

[17]   Mrs. Mikovic stated she obtained the residence documentation so as not to overstay her visitation time in the country.  The stickers were affixed to Mrs. Mikovic's and MPM's passports and allowed them to remain in Wales until 2011.  Perhaps surprisingly, other than Mrs. Mikovic's explanation, there was no other evidence offered as to the import of these stickers.

Britain on 2nd January, 2007." (Petitioner's Ex. 6.)[18]

While these "objective facts," looked at in isolation, favor petitioner's position, given the overall history of these parties' conduct and relationship and the plausible explanation that Mrs. Mikovic has given for her activities during her time in Wales, the Court finds that Mr. Mikovic has not proven by a preponderance of the evidence that "the objective facts point unequivocally to a new habitual residence." Ruiz 392 F.3d at 1254; see also Gitter, 396 F.3d at 135 (crediting mother's testimony that couple agreed the move was conditional). Nor can the Court say "with confidence" that MPM's relative attachments to the two countries has changed. Ruiz, 392 F.3d at 1254. Rather, the Court's assessment is that (1) the United States has been and continues to be MPM's habitual residence, (2) that but for Mr. Mikovic's immigration problems the couple and MPM would be living in the United States, and (3) that once Mr. Mikovic was deported in 2003, the couple unsuccessfully tried to live in Slovakia and then unsuccessfully tried to live in Wales. These were "trial periods" and "conditional" efforts to make their marriage work; "attempts to salvage the marriage, rather than commitment to staying [in Wales]" determined the length of stay in Wales. Ruiz 392 F.3d at 1258-59. In short, while acknowledging that this is a hard, close case, I conclude that this family was in "limbo during its stay" in Wales. Ruiz, 392

_____

[18]   This is somewhat curious because at that time, Mrs. Mikovic had not lived in Slovakia since she had returned to the United States from Slovakia in January 2005.

F.3d at 1255.  MPM's habitual residence remains the United States.[19]

## V.  **Conclusion**

The Court concludes that the Hague Convention does not require Mrs. Mikovic to return MPM to Wales.  The Court also understands that, as things stand now, Mr. Mikovic cannot return to the United States until 2013.  While the Court must base its decision on the law, I would be remiss if I did not express my hope that this couple find a way to keep Mr. Mikovic a part of MPM's life.  I would hope that the couple would try to reconcile, or at minimum continue their long-standing efforts to have Mr. Mikovic readmitted to the United States.  Failing this, I hope that appropriate custody, visitation and other arrangements will be made.[20]  Because, as is often true in family law cases, there are no real winners here.[21]

It is hereby

**ORDERED:**

1.    The Verified Petition, Pursuant To The Hague Convention, For Return Of Child To The Country Of Habitual Residence (Doc.1) is **DENIED.**

---

[19]  Because of the Court's disposition it need not address the affirmative defense of consent.

[20]  The Court assumes that the Florida family law court which is handling Mrs. Mikovic's divorce petition will resolve these issues.

[21]  The Court notes that counsel represented Petitioner *pro bono*, which the Court appreciates.  Counsel for both sides are commended for their professional presentations.

2.      The Order in Lieu of Preliminary Injunction, and stipulation contained therein, dated August 21, 2007 (Doc. 17), is **VACATED.**

3.      The Clerk is directed to return to Respondent Amy Ann Mikovic, or her counsel, the passports for Respondent and MPM.

4.      Each party shall bear their own fees and costs incurred in this matter.

5.      Judgment shall enter in accordance with this Order, and the Clerk shall close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 21st day of November, 2007.


TIMOTHY J. CORRIGAN
United States District Judge


jl.
Copies to:
Counsel of Record